DIFRANCESCO, BATEMAN, COLEY, YOSPIN
KUNZMAN, DAVIS, LEHRER & FLAUM, P.C.
15 Mountain Boulevard
Warren, NJ 07059-6327
908-757-7800
Attorneys for Plaintiff/Relator

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel* BART ROSSI and on behalf of the States of Florida, North Carolina, and Texas, | Civil Action No. |
| Plaintiffs/Relator, | FILED UNDER SEAL |
| -vs- | 31 U.S.C. §§ 3729-33 AND STATE LAW COUNTERPARTS |
| VERICARE, | |
| Defendant. | COMPLAINT AND JURY DEMAND |

Plaintiff United States of America (the "United States" or the "Government") by and through *qui tam* Relator, Bart Rossi ("Dr. Rossi"), by way of Complaint against the Defendant, states as follows:

**PRELIMINARY STATEMENT**

The United States of America, by and through *qui tam* Relator, Bart Rossi, brings this action under 31 U.S.C. §§ 3729-33 (The "False Claims Act") to recover from Vericare for all damages, penalties, and other remedies available under the False Claims Act on behalf of the United States and himself.  The United States of America and the Qui Tam States, by and through *qui tam* Relator, Bart Rossi, also bring this action under qui tam provisions of the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 *et seq.* and the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq.* to recover from Vericare for all

damages, penalties, and other remedies available under these statutes ("State qui tam statutes" or "Qui Tam States"). This suit is also filed in order to vindicate the rights of Dr. Rossi to engage in activity protected by the False Claims Act, 31 U.S.C. § 3730(h), and Conscientious Employee Protection Act, ("CEPA"), N.J.S.A. 34:19-1 *et. seq.* without fear of reprisal, discrimination based on age, hostile work environment and to seek relief necessary to make Dr. Rossi whole.

## JURISDICTION AND VENUE

1.      The jurisdiction of this Court over the claims arising under the False Claims Act is founded on 31 U.S.C. § 3730(b) and 3730(h).

2.      This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331 and 28 U.S.C. § 1345. The Court has original jurisdiction of the State law claims pursuant to 31 U.S.C. § 3732(b) because this action is brought under State laws for the recovery of funds paid by the Qui Tam States, and arises from the same transaction or occurrence brought on behalf of the United States under 31 U.S.C. § 3730.

3.      Venue lies in this district under 31 U.S.C. § 3732(a) and 28 U.S.C. §1391(b) and 1391(c) because the Relator is in this district and the Defendant transacts business in this district.

## THE PARTIES

4.      Plaintiff is the United States of America on behalf of its agency the United States Department of Health and Human Services ("HHS").

5.      Relator, Bart Rossi, is a resident of New Jersey residing at 250 Henley Place, Unit 410, Weehawkin, New Jersey.

6.      Vericare, a provider of geriatric mental health services, is headquartered in San Diego, California and has regional offices in California, Pennsylvania, Texas, New Jersey, Florida, Indiana, Delaware, Tennessee, and North Carolina.

7.     Vericare directly employs licensed behavioral healthcare professionals, including psychiatrists, psychologists, licensed clinical social workers, physicians, nurses and other medical professionals who provide behavioral health services and psychotherapy to elderly patients in nursing facilities and long-term care settings.  The patients and residents at these facilities suffer from various chronic health conditions, including Alzheimer's disease, dementia, depression and anxiety, among other illnesses, which make them one of the most vulnerable patient populations.  Psychiatrists, psychologists, licensed social workers and nurses employed by Vericare receive cash bonuses in addition to their regular salary based on how many services they provide and the level of reimbursement they generate for Vericare from government and other insurance providers, including Medicare and Medicaid.  Regional Managers employed by Vericare receive cash bonuses for procuring standing orders with nursing facilities so that each new patient in a nursing home serviced by Vericare is seen by a Vericare psychologist.

## FACTUAL ALLEGATIONS

8.     In 1978, Dr. Rossi founded the Rossi Psychological Group (hereinafter "Rossi Group") based out of Somerville, New Jersey.

9.     The Rossi Group was a behavioral health services organization with licensed mental health/behavioral health professionals delivering developed assessments and counseling to elderly residents in almost 150 nursing facilities throughout New Jersey.

10.     In May 2009, Dr. Rossi sold the Rossi Psychological Group to Vericare, a provider of geriatric mental health services.  Vericare's Chief Executive Officer at the time, David Flaugh, handled much of the transaction.

11.     In 2009, Rossi received a bonus of approximately $40,000.  In 2010, Rossi received an additional 50,000 stock options, which increased his total stock options to 300,000.

3

12.     In 2012, there was a change in upper management at Vericare.  Specifically, in January 2012, David Flaugh resigned as Chief Executive Officer.  Also, in 2012, the Vice President in charge of Psychological Services, Dr. MJ Giorgiev, resigned and Molly Chase, who was responsible for Human Resources and Recruitment at Vericare, was terminated.

13.     In 2012, members of Vericare's upper management consisted of Donald Myll, Chief Executive Officer (hereinafter "Myll"); Cindy Watson, Executive Vice President of Operations (hereinafter "Watson"); Cammile C. Bird, Vice President, Sales and Marketing (hereinafter "Bird"), amongst other members.

14.     The United States, through Health and Human Services, administers the Supplementary Medical Insurance Program for the Aged and Disabled, established by Part B, Title XVIII, of the Social Security Act, 42 U.S.C. § 1395 *et seq.* ( "Medicare").  Medicare establishes an insurance program to provide medical insurance benefits for aged and disabled individuals in accordance with the applicable provisions, which is financed from premium payments by enrollees together with contributions from funds appropriated by the Federal Government.

15.     Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS") through local carriers, called Medicare Administrative Contractors ("MACs"), which process claims from providers for reimbursement from Medicare.  In addition to processing claims, MACs also issue Local Coverage Determinations ("LCDs"), which are decisions regarding whether to cover a particular service in accordance with Section 1862(a)(1)(A) of the Social Security Act, 42 U.S.C. § 1395(y).  NHIC, Inc. and Novitas Solutions, Inc. are the MACs under contract to administer Medicare Part B claims arising from services provided in New Jersey.

4

16.     As a medical provider, Vericare, is required to submit claims to Medicare by submitting claims to the MAC for the area in which the services were rendered. In submitting these claims, Vericare is required to identify the services they performed by using the codes contained in the American Medical Association's Current Procedural Terminology manual, which are commonly referred to as "CPT" codes. The claims are also required to reflect, among other things: (a) the diagnosis code that accurately identifies the medical diagnosis or the patient's condition; (b) the date the service was rendered; and (c) the name of the patient who received the service. Upon receiving a provider's claim, the local carriers, each applying its own and CMS's policies, determine whether a procedure or service is adequately documented, whether it is medically necessary and whether the claim otherwise qualifies for payment. Local carriers also compute the proper amount of reimbursement for qualified claims.

17.     Medicare's reimbursement to providers varies depending on the type, level and complexity of the services rendered. This information is reflected in the CPT code included in the claim submitted to the local carrier. Vericare submits its claims to the local carriers electronically. Before Medicare carriers accept electronically-submitted claims, each provider is required to agree in writing that it is responsible for the accuracy of the Medicare claims submitted on its behalf and that all claims submitted under its provider number are accurate, complete and truthful. Prior to electronic submission of claims, providers submitted hard copy certifications of the accuracy of their claims for reimbursement to Medicare.

18.     Medicare prohibits payment for services that are not "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). This means the services must be for the purpose of diagnostic study or the services must reasonably be expected to improve the patient's condition.

5

The treatment must, at a minimum, be designed to reduce or control the patient's psychiatric symptoms so as to prevent relapse or hospitalization, and improve or maintain the patient's level of functioning. When a patient reaches a point in his/her treatment where further improvement does not appear to be indicated and there is no reasonable expectation of improvement, the outpatient psychiatric services are no longer considered reasonable or medically necessary.

19.    Local Coverage Determination ("LCD") L27514 provides that individual and group psychotherapy services are not considered medically necessary if a review of medical records indicates that dementia and Alzheimer's Disease have produced a severe enough cognitive defect to prevent psychotherapy from being effective and that the medical service provider must document the medical necessity for continued treatments. LCD L27514 states that:

> To benefit from psychotherapy, an individual must be cognitively intact to the degree that he/she can engage in a meaningful verbal interaction with the therapist (except for family therapy without the patient present, and where interactive psychotherapy is necessary). Psychotherapy services are not covered when documentation indicates that dementia has produced a severe enough cognitive defect to prevent establishment of a relationship with the therapist which allows insight-oriented, behavior-modifying or supportive therapy to be effective. If psychotherapy is provided to a patient with dementia, the patient's record should document that the patient's cognitive level of functioning was sufficient to permit the patient to participate meaningfully in the treatment.

20.    Medicare also prohibits payment for any claim "unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period." 42 U.S.C. § 1395l(e). This provision requires submission of adequate documentation to evaluate the claim for payment.

21.    Local Coverage Determination ("LCD") L27485 provides that "standing" orders for care by other provider specialties, such as psychology and psychiatry, and provision of

routine screening services have resulted in considerable over utilization, and so are being addressed by this policy. Specifically, LCD L274855 states that:

> Services or procedures rendered in a nursing facility are not eligible in the following situations: A "p.r.n." or "standing order" is written for any provider specialty or for any routine screening service, either on the physician's order sheet or integral to the patient's comprehensive care plan, or elsewhere in the patient's medical record.

22.     In 1965, Congress enacted Title XIX of the Social Security Act to expand the nation's medical assistance program for the needy and the medically needy aged, blind, disabled, and families with dependent children and provide rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care. 42 U.S.C. §§ 1396-1396w. This became known as the "Medicaid Program." The Medicaid Program is funded by both Federal and State monies, collectively referred to as "Medicaid Funds," with the federal contribution computed separately for each state. 42 U.S.C. §§ 1396b; 1396d(b).

23.     Each State is permitted, within certain parameters, to design its own medical assistance plan, subject to approval by the HHS. Among other forms of medical assistance, the States are permitted to provide medical assistance from the Medicaid Funds to eligible persons for nursing facility services. 42 U.S.C. § 1396r; 1396d(f).

24.     HHS is responsible for the administration, supervision and funding of the federal Medicaid Program. CMS is the division of HHS that is directly responsible for administering the federal Medicaid Program.

25.     Federal law specifically prohibits providers from making "any false statement or representation of a material fact in any application for any ... payment under a Federal health care program." See 42 U.S.C. §1320-a-7b(a)(l). "Federal health care program" is defined as "any plan or program that provides health benefits, whether directly, through insurance, or

otherwise, which is funded directly, in whole or in part, by the United States Government... or any State health care program..." 42 U.S.C. §1320-a-7b(f).

26.     The requirement that providers be truthful in submitting claims for reimbursement is a precondition for participation in the Medicare program, the Medicaid program, and other Federal and State funded health care programs. See, e.g., 42 CFR §§ 1003.105, 1003.102(a)(1)-(2).

27.     Beginning in 2012, Vericare began taking advantage of the extensive program of Medicare and Medicaid services available to this vulnerable elderly patient population and violated Medicare and Medicaid provisions, by submitting fraudulent claims to Medicare and Medicaid, which included billing for services and follow-up services for patients that were unnecessary, such as psychotherapy and psychological services for patients who lacked the capacity to benefit from these services because they were suffering from severe dementia and/or cognitive disorders.

28.     Vericare also billed Medicare and Medicaid for unnecessary and duplicative psychiatric diagnostic examinations that violated Medicare and Medicaid rules in that the Vericare doctor or other medical professional conducting the examination failed to (i) document the patient's medical and/or psychiatric history, (ii) conduct an adequate mental status test, (iii) coordinate with other health care professionals treating the patient, and/or (iv) otherwise comply with Medicare and/or Medicaid rules.  In addition, Vericare billed for services without any documentation in the medical record to substantiate the services.

29.     Specifically, on or around September 11, 2012, Dr. Rossi sent correspondence to Myll, Watson, Bird and others discussing three factors in determining New Jersey's ratio of follow-up sessions to competency evaluations, wherein he states: "1. Psychologists in NJ are one

of two physicians needed to determine competency. Therefore are psychologists complete DIs with no follow-up visits for this purpose. I would estimate at least 10 to 20 per month. 2. The apns working in skilled and the ALF settings have a significant case load that is only medication management and periodic sessions (every 6 to 8 weeks perhaps) take place for these residents. 3. Dr. Levine has been carefully set up in a number of facilities where he provides many DIs with very limited follow up sessions. Other organizations in the buildings deliver follow up sessions."

30.     On or around September 19, 2012, Myll sent electronic correspondence to Dr. Rossi copying Watson responding to Dr. Rossi's electronic correspondence and stated:   In response to 1, "If we assumed that 20 competency evals would have resulted in say 7 sessions each and assume that they all happened in the same month or came from competency evals from prior months that would add 140 sessions and about .3 sessions per referral for the month. Not too significant." In response to 2, "What about when you factor in the APNs that are doing ongoing counseling as we discussed which would increase the sessions per DI? Don't most of our APNs do followup counseling?" In response to 3, "If you take Levine's DIs and assume that these instead resulted in 7 followup sessions and that they all happened in the same month or came from previous months, that would result in 784 sessions (he averaged 112 DIs per month May – Aug), that would add about 1.2 sessions per referral." Myll's correspondence demonstrates Vericare's upper management's emphasis on ratios and disregard for appropriate medical services as well as the focus on adding more follow-up sessions with patients regardless of necessity solely to increase profits based on reimbursement from Medicare for services.

31.     On or around September 19, 2012, Dr. Rossi sent correspondence to Myll copying Watson responding to Myll's electronic correspondence and stated:   In response to 1, "The competency evals result in no follow ups in almost all cases. The reason we are asked is that the

person is most likely not competent.  Psychologists in NJ are licensed as physicians under the law to be one of two "doctors" to determine competency.  My conclusion is that our ratio would be lower because of no follow ups regarding this situation."  In response to 2, "As we discussed the apns do evals and follow up visits like psychologists do here in NJ so in this regard there is a parallel.  However, our apns also have a significant number of cases where there is only period medication management with recommendations.  These residents are not seen regularly.  The conclusion as we both seemed to agree is that the apns would then have a case load that would not be exactly like psychologists and their ratios would be lower due to those residents on medication management."  In response to 3, "With regard to Dr. Levine we carefully placed him in buildings that called us with the need for a psychologist to perform evals.  Comprehensive Geriatric and Elder Care are the companies that were in the facilities first with social workers performing evals and follow ups.  I arranged for Dr. Levine to get in a perform Evals with Comprehensive Geriatric and Elder Care social workers doing the follow ups.  This was obviously up Dr. Levine's alley but also it is important to note that he is our best expert on medical/psychological evaluations.  He has a reputation as an expert because of his medical and psychological knowledge.  Therefore we are using him to his best advantage and ours as well.  He does very well financially and so does Vericare.  He is unique and certainly not typical but his limited follow ups also skew our numbers."  Dr. Rossi's correspondence communicated to Vericare's upper management why New Jersey's ratio was lower than other regions, and that his focus was on the necessity of the follow-up sessions for the patients and complying with Medicare rules and regulations; not adding more follow-up sessions regardless of necessity solely to increase Vericare profits based on reimbursement from Medicare for services.

32.     In violation of Medicare and Medicaid regulations, Vericare created a "Vericare Standing Order Form," which required all new residents in nursing home facilities serviced by Vericare to be seen by a Vericare provider, which resulted in thousands of unnecessary sessions. Vericare then pushed Regional Managers to obtain **standing orders** by paying specific cash bonuses for procuring the standing orders.

33.     In addition, Vericare incentivized its Regional Managers and the psychologists, licensed social workers and nurses that it employed to perform unnecessary and duplicative services by compensating them based on how many services they provided and the level at which Medicare and Medicaid reimbursed for those services.

34.     Specifically, on or around October 25, 2012, with the approval of the Vericare Board, Watson sent electronic correspondence to all of its psychologists and licensed clinical social workers detailing a premium pay program, which would go into effect on November 1, 2012.  Therein, it stated that premium pay will be paid and calculated as follows:  "clinicians performing eight or less sessions on a given day would not be eligible for premium pay for that day's work; clinicians performing between nine and eleven sessions on a given day would receive an additional $1.00 per session on all sessions performed that day; clinicians performing between twelve and fifteen sessions on a given day would receive an additional $1.00 per session on all session performed that day plus another $1.00 per sessions for sessions twelve, thirteen, fourteen and fifteen."  As stated in this correspondence, this incentive plan provided an earnings potential of more than $400 per month in premium pay on top of normal compensation.  This program demonstrates Vericare incentive and focus to increase profits based on reimbursement from Medicare and Medicaid for services regardless of their actual necessity for the patients.

35.     Specifically, on or around November 2, 2012, with the approval of the Vericare Board, Watson sent electronic correspondence to Vericare Regional Managers regarding the 2012 Regional Manager bonus program, wherein she stated: "The RM bonus this year will be based on one single indicator; **contribution to corporate $$.** For those of you who are new to Vericare contribution to corporate (CTC) is the amount left over after your pay your clinicians (director labor and direct other) and your regional costs which includes the total cost of the RM and the AE and any other regional costs including a percentage for bad debt.  If you meet or exceed the quarterly CTC $$ amount you will be eligible for a bonus-if you miss the CTC operating plan target you will not earn a bonus for that quarter…The RM bonus plan for this year will allow each of you to earn up to 20% of your base salary; on a quarterly basis you can earn ¼ of that amount.  For example if you make $50,000/year your bonus pool is 20% of that or $10,000 which means that if you meet your quarterly contribution to corporate goal you would receive $2,500 for the quarter."  Vericare's 2012 bonus program for Regional Managers is another indication of Vericare's upper management strategy to encourage and incentivize Regional Managers to increase numbers in evaluations and/or follow-up sessions to increase profits for Vericare regardless of the necessity of those services.

36.     On or around November 2, 2012, Watson sent electronic correspondence to Dr. Rossi wherein she stated:  "Here are the Q2 bonus calculations-unfortunately even though the region exceeded plan for revenue-margin performance was less than plan and resulted in a miss on contribution to corporate."  Dr. Rossi did not agree with Vericare's bonus program that solely focused on numbers and sent electronic correspondence to Watson, on or around November 2, 2012, requesting an assessment that did not solely focus on numbers.

37.     At the same time, Vericare's compliance program was inadequate to counter those incentives by ensuring that unnecessary and duplicative services were not billed.  As a result, Vericare submitted thousands of fraudulent claims to Medicare and Medicaid and were paid based on those claims.

38.     Beginning in 2012, Dr. Rossi objected to the fraudulent practices implemented under Vericare's new management and refused to engage in Medicare fraud in order to increase his numbers at the New Jersey facilities he was in charge of.  Specifically, Vericare management disregarded the competency evaluations of patients and pushed Dr. Rossi to conduct follow-up sessions on patients determined to be "not competent," therefore, rendering the session not medically necessary.  Dr. Rossi objected to this practice as well as the demand that every patient in a rehabilitation facility receive two to five therapy sessions per week regardless of necessity as is the practice by Vericare in other states.  Dr. Rossi also objected to the need for every patient in a rehabilitation setting to be evaluated by a psychologist, too many sessions with patients who had cognitive problems, caseload calculators pushing three or more sessions per month per patient, overuse of psychological testing, the "Vericare Standing Order Form" and push for **standing orders** so that each new patient in a nursing home serviced by Vericare is seen by a Vericare psychologist, cash bonuses given to Vericare Regional Managers for procuring standing orders with nursing facilities, and cash bonuses to psychologists, licensed social workers and nurses for services that were above a set high number.

39.     These newly adopted practices of Vericare led to extremely excessive billing for evaluations, a significant amount of unnecessary psychological evaluations and hundreds of thousands of needless psychotherapy follow-up sessions.   These illegal practices were implemented solely to increase Vericare's profits.  These practices were a violation of Medicare

and Medicaid's provisions and Vericare improperly received funds allocated for the Medicare and Medicaid program.

40.     In response to Dr. Rossi's objections to committing unlawful conduct, Vericare's upper management, specifically, Myll, Watson and Bird, minimized Dr. Rossi's efforts and involvement within Vericare, ignored Dr. Rossi's suggestions for business development and instead put pressure on Dr. Rossi to conduct fraudulent business.

41.     Vericare's management also consistently accused Dr. Rossi's region of being unsuccessful despite proof that it held the top position in New Jersey and faced growing competition.

42.     Specifically, on or around May 28, 2012, Myll sent electronic correspondence to Dr. Rossi wherein he states: "I wanted to get back to you regarding your option request. Given the company's overall 2011 disappointing performance, only the relatively small number of options granted to employees under the standing policy, is all that the BOD is up for granting now. The performance of your NJ and MA regions did not set you apart of overall company results to lead the BOD to an exception for you."

43.     In addition, on or around December 7, 2012, Myll sent electronic correspondence to Dr. Rossi copying Watson and Bird wherein he states:  "Your region is performing significantly behind our mutually prepared plan and last year. Let's put it into perspective. Less than last year in a growing market!  Now we can talk about the reasons behind this disappointment but in the end what we are doing in New Jersey has not worked this year. Blaming it on competition as if it is solely an external factor that we have no control over is not acceptable. Changes in new ideas, new disciplines teamwork, etc. are needed. From what I can tell, we have not adjusted our strategy in New Jersey for our base business."

44.     Dr. Rossi was anticipating a bonus for his performance in calendar year 2011, but he did not receive one under the new management.

45.     In 2012, Dr. Rossi supervised Regional Manager, Steve Fairorth (hereinafter "Fairorth"). Vericare provided Fairorth with a sizable bonus for 2012 to which Dr. Rossi helped him achieve yet Vericare awarded no bonus to Dr. Rossi for his efforts in 2012.

46.     Shortly thereafter, in December 2012, Fairorth was laid off and Vericare put Dr. Rossi along with Regional Manager, Lisa Galasso, in charge of Fairorth's region, which included Pennsylvania and Delaware. This led to an immense increase in workload yet Dr. Rossi received no salary increase. Dr. Rossi was now serving as the Vice President and General Manager of Vericare's Mid-Atlantic Region.

47.     In February 2013, Dr. Rossi complained to Dr. Thomas Cooper, Chairman of the Board of Directors, regarding Vericare's fraudulent practices and the hostile work environment caused by Vericare's upper management.

48.     Myll called Dr. Rossi just before Dr. Rossi's meeting with Dr. Cooper to reprimand him for complaining to Dr. Cooper. Myll pressed Dr. Rossi to tell him what Dr. Rossi was going to tell Dr. Cooper prior to Dr. Rossi's meeting with Dr. Cooper.

49.     Vericare's method for growing business was a concern for Dr. Rossi as he believed it involved violations of Medicare and Medicaid's Rules and Regulations, which he brought to Dr. Cooper's attention.

50.     After Dr. Rossi complained to Dr. Cooper, Vericare removed two territories from Dr. Rossi and put them under the supervision of a younger person. In addition, Dr. Rossi was thereafter excluded from meetings and communications regarding a facility called Buttonwood, which he was instrumental in bringing to Vericare. Plans and issues were discussed and

formulated without any input from Dr. Rossi although he was the contact person and the originator of this business venture.

51.     Vericare hired a consultant in response to Dr. Rossi's complaint.  The consultant conducted a sham investigation into Dr. Rossi's complaints.   The investigation was never concluded and no findings were issued.

52.     On or around May 22, 2013, Dr. Rossi's counsel sent correspondence to Vericare's counsel providing a copy of Dr. Rossi's complaint to Dr. Cooper and informing Vericare's counsel of the retaliation that has followed.

53.     On or around May 31, 2013, in retaliation for Dr. Rossi's reporting Vericare's fraudulent practices and discriminatory actions towards him, Vericare turned off Dr. Rossi's cell phone.

54.     Subsequently, on or around June 15, 2013, in further retaliation for Dr. Rossi's complaints regarding discrimination by upper management at Vericare and the company's violations of Medicare and Medicaid, Vericare terminated Dr. Rossi's employment.

## FIRST COUNT
### Violations of the False Claims Act: Presenting False Claims for Payment
### (31 U.S.C. § 3729(a)(1)(2006), and, as amended, 31 U.S.C. § 3729(a)(1)(A))

55.     Dr. Rossi, on behalf of the United States, repeats and realleges the allegations as set forth in Paragraphs 1 through 54 as if fully set forth at length herein.

56.     Dr. Rossi, on behalf of the United States, seeks relief against defendant under Section 3729(a)(1) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(2006), and, as amended, 31 U.S.C. § 3729(a)(1)(A).

57.     As set forth above, in connection with the foregoing schemes, defendant knowingly, or with reckless disregard for the truth, presented and/or caused to be presented false or fraudulent claims for payment by the federal government.

58.     Beginning in 2012, Vericare began taking advantage of the extensive program of Medicare and Medicaid services available to this vulnerable elderly patient population and violated Medicare and Medicaid provisions, by submitting fraudulent claims to Medicare and Medicaid, which included billing for services and follow-up services for patients that were unnecessary, such as psychotherapy and psychological services for patients who lacked the capacity to benefit from these services because they were suffering from severe dementia and/or cognitive disorders.

59.     Vericare also billed Medicare and Medicaid for unnecessary and duplicative psychiatric diagnostic examinations that violated Medicare and Medicaid rules in that the Vericare doctor or other medical professional conducting the examination failed to (i) document the patient's medical and/or psychiatric history, (ii) conduct an adequate mental status test, (iii) coordinate with other health care professionals treating the patient, and/or (iv) otherwise comply with Medicare and/or Medicaid rules.   In addition, Vericare billed for services without any documentation in the medical record to substantiate the services.

60.     In violation of Medicare and Medicaid regulations, Vericare created a "Vericare Standing Order Form," which required all new residents in nursing home facilities serviced by Vericare to be seen by a Vericare provider, which resulted in thousands of unnecessary sessions. Vericare then pushed Regional Managers to obtain **standing orders** by paying specific cash bonuses for procuring the standing orders.

61.     At the same time, Vericare's compliance program was inadequate to counter those incentives by ensuring that unnecessary and duplicative services were not billed.  As a result, Vericare submitted thousands of fraudulent claims to Medicare and Medicaid and were paid based on those claims.

62.     These newly adopted practices of Vericare led to extremely excessive billing for evaluations, a significant amount of unnecessary psychological evaluations and hundreds of thousands of needless psychotherapy follow-up sessions.   These illegal practices were implemented solely to increase Vericare's profits.  These practices were a violation of Medicare and Medicaid's provisions and Vericare improperly received funds allocated for the Medicare and Medicaid program.

63.     By reason of these false claims, the United States has sustained damages in a substantial amount to be determined at trial.

64.     Dr. Rossi prays that judgment be entered against Defendant for all applicable damages, including but not limited to the following: actual damages, civil penalties in an amount of three times the actual damages suffered by the Government, relator seeks a fair and reasonable amount of any award for his contribution to the Government's investigation and recovery pursuant to 31 U.S.C. §§ 3730(b) and (d) of the False Claims Act, attorney's fees and costs awarded to Relator, pre-judgment and post judgment interest and all other relief on behalf of the Relator and/or United States Government to which they may be entitled at law or equity.

## SECOND COUNT
### Violations of the False Claims Act: Use of False Statements
### (31 U.S.C. § 3729(a)(2)(2006), and, as amended, 31 U.S.C. § 3729(a)(1)(B))

65.     Dr. Rossi, on behalf of the United States, repeats and realleges the allegations as set forth in Paragraphs 1 through 64 as if fully set forth at length herein.

66.     Dr. Rossi, on behalf of the United States, seeks relief against defendant under Section 3729(a)(1) of the False Claims Act, 31 U.S.C. § 3729(a)(2)(2006), and, as amended, 31 U.S.C. § 3729(a)(1)(B).

67.     As set forth above, in connection with the foregoing schemes, defendant knowingly, or with reckless disregard for the truth, made, used, and caused to be made and used false records and statements to get false or fraudulent claims paid by the federal government.

68.     Beginning in 2012, Vericare began taking advantage of the extensive program of Medicare and Medicaid services available to this vulnerable elderly patient population and violated Medicare and Medicaid provisions, by submitting fraudulent claims to Medicare and Medicaid, which included billing for services and follow-up services for patients that were unnecessary, such as psychotherapy and psychological services for patients who lacked the capacity to benefit from these services because they were suffering from severe dementia and/or cognitive disorders.

69.     Vericare also billed Medicare and Medicaid for unnecessary and duplicative psychiatric diagnostic examinations that violated Medicare and Medicaid rules in that the Vericare doctor or other medical professional conducting the examination failed to (i) document the patient's medical and/or psychiatric history, (ii) conduct an adequate mental status test, (iii) coordinate with other health care professionals treating the patient, and/or (iv) otherwise comply with Medicare and/or Medicaid rules.  In addition, Vericare billed for services without any documentation in the medical record to substantiate the services.

70.     In violation of Medicare and Medicaid regulations, Vericare created a "Vericare Standing Order Form," which required all new residents in nursing home facilities serviced by Vericare to be seen by a Vericare provider, which resulted in thousands of unnecessary sessions.

Vericare then pushed Regional Managers to obtain **standing orders** by paying specific cash bonuses for procuring the standing orders.

71.     At the same time, Vericare's compliance program was inadequate to counter those incentives by ensuring that unnecessary and duplicative services were not billed. As a result, Vericare submitted thousands of fraudulent claims to Medicare and Medicaid and were paid based on those claims.

72.     These newly adopted practices of Vericare led to extremely excessive billing for evaluations, a significant amount of unnecessary psychological evaluations and hundreds of thousands of needless psychotherapy follow-up sessions. These illegal practices were implemented solely to increase Vericare's profits. These practices were a violation of Medicare and Medicaid's provisions and Vericare improperly received funds allocated for the Medicare and Medicaid program.

73.     By reason of these false claims, the United States has sustained damages in a substantial amount to be determined at trial.

74.     Dr. Rossi prays that judgment be entered against Defendant for all applicable damages, including but not limited to the following: actual damages, civil penalties in an amount of three times the actual damages suffered by the Government, relator seeks a fair and reasonable amount of any award for his contribution to the Government's investigation and recovery pursuant to 31 U.S.C. §§ 3730(b) and (d) of the False Claims Act, attorney's fees and costs awarded to Relator, pre-judgment and post judgment interest and all other relief on behalf of the Relator and/or United States Government to which they may be entitled at law or equity.

**THIRD COUNT**
**Violations of the False Claims Act: Anti-Retaliation Provision**
**(31 U.S.C. § 3730(h))**

75.     Relator Dr. Rossi repeats and realleges the allegations as set forth in Paragraphs 1 through 74 as if fully set forth at length herein.

76.     The foregoing actions of defendant are in violation of the False Claims Act, 31 U.S.C. § 3730(h).

77.     Beginning in 2012, Dr. Rossi objected to the fraudulent practices implemented under Vericare's new management and refused to engage in Medicare fraud in order to increase his numbers at the New Jersey facilities he was in charge of. Specifically, Vericare management disregarded the competency evaluations of patients and pushed Dr. Rossi to conduct follow-up sessions on patients determined to be "not competent," therefore, rendering the session not medically necessary. Dr. Rossi objected to this practice as well as the demand that every patient in a rehabilitation facility receive two to five therapy sessions per week regardless of necessity as is the practice by Vericare in other states. Dr. Rossi also objected to the need for every patient in a rehabilitation setting to be evaluated by a psychologist, too many sessions with patients who had cognitive problems, caseload calculators pushing three or more sessions per month per patient, overuse of psychological testing, the "Vericare Standing Order Form" and push for standing orders so that each new patient in a nursing home serviced by Vericare is seen by a Vericare psychologist, cash bonuses given to Vericare Regional Managers for procuring standing orders with nursing facilities, and cash bonuses to psychologists, licensed social workers and nurses for services that were above a set high number.

78.     Defendant retaliated against Dr. Rossi as a result of Dr. Rossi engaging in protected activity as set forth herein. In response to Dr. Rossi's objections to committing

unlawful conduct, Vericare's upper management, specifically, Myll, Watson and Bird, minimized Dr. Rossi's efforts and involvement within Vericare, ignored Dr. Rossi's suggestions for business development and instead put pressure on Dr. Rossi to conduct fraudulent business.

79.      Vericare's management also consistently accused Dr. Rossi's region of being unsuccessful despite proof that it held the top position in New Jersey and faced growing competition.

80.      In 2012, Dr. Rossi supervised Regional Manager Fairorth.  Vericare provided Fairorth with a sizable bonus for 2012 to which Dr. Rossi helped him achieve yet Vericare awarded no bonus to Dr. Rossi for his efforts in 2012.

81.      Shortly thereafter, in December 2012, Fairorth was laid off and Vericare put Dr. Rossi along with Regional Manager, Lisa Galasso, in charge of Fairorth's region, which included Pennsylvania and Delaware.  This led to an immense increase in workload yet Dr. Rossi received no salary increase.  Dr. Rossi was now serving as the Vice President and General Manager of Vericare's Mid-Atlantic Region.

82.      In January 2013, Dr. Rossi complained to Dr. Thomas Cooper, Chairman of the Board of Directors, regarding Vericare's fraudulent practices and the hostile work environment caused by Vericare's upper management.

83.      Myll called Dr. Rossi just before Dr. Rossi's meeting with Dr. Cooper to reprimand him for complaining to Dr. Cooper.  Myll pressed Dr. Rossi to tell him what Dr. Rossi was going to tell Dr. Cooper prior to Dr. Rossi's meeting with Dr. Cooper.

84.      Vericare's method for growing business was a concern for Dr. Rossi as he believed it involved violations of Medicare and Medicaid's Rules and Regulations, which he brought to Dr. Cooper's attention.

85.     After Dr. Rossi complained to Dr. Cooper, Vericare removed two territories from Dr. Rossi and put them under the supervision of a younger person.  In addition, Dr. Rossi was thereafter excluded from meetings and communications regarding a facility called Buttonwood, which he was instrumental in bringing to Vericare.  Plans and issues were discussed and formulated without any input from Dr. Rossi although he was the contact person and the originator of this business venture.

86.     Vericare hired a consultant in response to Dr. Rossi's complaint.  The consultant conducted a sham investigation into Dr. Rossi's complaints.  The investigation was never concluded and no findings were issued.

87.     On or around May 22, 2013, Dr. Rossi's counsel sent correspondence to Vericare's counsel providing a copy of Dr. Rossi's complaint to Dr. Cooper and informing Vericare's counsel of the retaliation that has followed.

88.     On or around May 31, 2013, in retaliation for Dr. Rossi's reporting Vericare's fraudulent practices and discriminatory actions towards him, Vericare turned off Dr. Rossi's cell phone.

89.     Subsequently, on or around June 15, 2013, in further retaliation for Dr. Rossi's complaints regarding discrimination by upper management at Vericare and the company's violations of Medicare and Medicaid, Vericare terminated Dr. Rossi's employment.

90.     As a direct and proximate result of Defendant's actions in violation of the False Claims Act, Dr. Rossi has suffered severe emotional distress with physical manifestations, humiliation, embarrassment, loss of income, and other severe financial losses.

WHEREFORE, Bart Rossi, demands judgment against the defendant, Vericare, for compensatory damages, punitive damages, attorney's fees, interest, cost of suit, and such other and further relief as the Court deems equitable and just.

## FOURTH COUNT
### Violations of the Conscientious Employee Protections Act
### (N.J.S.A. 34:19-1)

91.    Relator Dr. Rossi repeats and realleges the allegations as set forth in Paragraphs 1 through 90 as if fully set forth at length herein.

92.    The foregoing actions of defendant are in violation of the Conscientious Employee Protections Act ("CEPA"), N.J.S.A. 34:19-1 *et. seq.*

93.    Beginning in 2012, Dr. Rossi objected to the fraudulent practices implemented under Vericare's new management and refused to engage in Medicare fraud in order to increase his numbers at the New Jersey facilities he was in charge of. Specifically, Vericare management disregarded the competency evaluations of patients and pushed Dr. Rossi to conduct follow-up sessions on patients determined to be "not competent," therefore, rendering the session not medically necessary. Dr. Rossi objected to this practice as well as the demand that every patient in a rehabilitation facility receive two to five therapy sessions per week regardless of necessity as is the practice by Vericare in other states. Dr. Rossi also objected to the need for every patient in a rehabilitation setting to be evaluated by a psychologist, too many sessions with patients who had cognitive problems, caseload calculators pushing three or more sessions per month per patient, overuse of psychological testing, the "Vericare Standing Order Form" and push for standing orders so that each new patient in a nursing home serviced by Vericare is seen by a Vericare psychologist, cash bonuses given to Vericare Regional Managers for procuring standing

orders with nursing facilities, and cash bonuses to psychologists, licensed social workers and nurses for services that were above a set high number.

94.    Defendant retaliated against Dr. Rossi as a result of Dr. Rossi engaging in protected activity as set forth herein.  In response to Dr. Rossi's objections to committing unlawful conduct, Vericare's upper management, specifically, Myll, Watson and Bird, minimized Dr. Rossi's efforts and involvement within Vericare, ignored Dr. Rossi's suggestions for business development and instead put pressure on Dr. Rossi to conduct fraudulent business.

95.    Vericare's management also consistently accused Dr. Rossi's region of being unsuccessful despite proof that it held the top position in New Jersey and faced growing competition.

96.    In 2012, Dr. Rossi supervised Regional Manager Fairorth.  Vericare provided Fairorth with a sizable bonus for 2012 to which Dr. Rossi helped him achieve yet Vericare awarded no bonus to Dr. Rossi for his efforts in 2012.

97.    Shortly thereafter, in December 2012, Fairorth was laid off and Vericare put Dr. Rossi along with Regional Manager, Lisa Galasso, in charge of Fairorth's region, which included Pennsylvania and Delaware.  This led to an immense increase in workload yet Dr. Rossi received no salary increase.  Dr. Rossi was now serving as the Vice President and General Manager of Vericare's Mid-Atlantic Region.

98.    In January 2013, Dr. Rossi complained to Dr. Thomas Cooper, Chairman of the Board of Directors, regarding Vericare's fraudulent practices and the hostile work environment caused by Vericare's upper management.

99.    Myll called Dr. Rossi just before Dr. Rossi's meeting with Dr. Cooper to reprimand him for complaining to Dr. Cooper. Myll pressed Dr. Rossi to tell him what Dr. Rossi was going to tell Dr. Cooper prior to Dr. Rossi's meeting with Dr. Cooper.

100.    Vericare's method for growing business was a concern for Dr. Rossi as he believed it involved violations of Medicare and Medicaid's Rules and Regulations, which he brought to Dr. Cooper's attention.

101.    After Dr. Rossi complained to Dr. Cooper, Vericare removed two territories from Dr. Rossi and put them under the supervision of a younger person. In addition, Dr. Rossi was thereafter excluded from meetings and communications regarding a facility called Buttonwood, which he was instrumental in bringing to Vericare. Plans and issues were discussed and formulated without any input from Dr. Rossi although he was the contact person and the originator of this business venture.

102.    Vericare hired a consultant in response to Dr. Rossi's complaint. The consultant conducted a sham investigation into Dr. Rossi's complaints. The investigation was never concluded and no findings were issued.

103.    On or around May 22, 2013, Dr. Rossi's counsel sent correspondence to Vericare's counsel providing a copy of Dr. Rossi's complaint to Dr. Cooper and informing Vericare's counsel of the retaliation that has followed.

104.    On or around May 31, 2013, in retaliation for Dr. Rossi's reporting Vericare's fraudulent practices and discriminatory actions towards him, Vericare turned off Dr. Rossi's cell phone.

105.    Subsequently, on or around June 15, 2013, in further retaliation for Dr. Rossi's complaints regarding discrimination by upper management at Vericare and the company's violations of Medicare and Medicaid, Vericare terminated Dr. Rossi's employment.

106.    As a direct and proximate result of Defendant's actions in violation of the CEPA, Dr. Rossi has suffered severe emotional distress with physical manifestations, humiliation, embarrassment, loss of income, and other severe financial losses.

WHEREFORE, Bart Rossi, demands judgment against the defendant, Vericare, for compensatory damages, punitive damages, attorney's fees, interest, cost of suit, and such other and further relief as the Court deems equitable and just.

## FIFTH COUNT
### Violations of the New Jersey Law Against Discrimination: Age Discrimination
### (N.J.S.A. 10:5-1)

107.    Relator Dr. Rossi repeats and realleges the allegations set forth in Paragraphs 1 through 106 as if fully set forth at length herein.

108.    Vericare removed two territories from Dr. Rossi and put them under the supervision of a younger person.  In addition, Dr. Rossi was thereafter excluded from meetings and communications regarding a facility called Buttonwood, which he was instrumental in bringing to Vericare.  Plans and issues were discussed and formulated without any input from Dr. Rossi although he was the contact person and the originator of this business venture.

109.    The foregoing actions of defendant were based upon Dr. Rossi's age in violation of the New Jersey Law Against Discrimination ("NJLAD") N.J.S.A. 10:5-1 *et. seq*.

110.    As a direct and proximate result of Defendant's actions, Dr. Rossi has suffered severe emotional distress with physical manifestations, humiliation, embarrassment, loss of income, and other severe financial losses.

WHEREFORE, Bart Rossi, demands judgment against the defendant, Vericare, for compensatory damages, punitive damages, attorney's fees, interest, cost of suit, and such other and further relief as the Court deems equitable and just.

## SIXTH COUNT
### Violations of the New Jersey Law Against Discrimination: Hostile Work Environment
### (N.J.S.A. 10:5-1)

111.    Relator Dr. Rossi repeats and realleges the allegations set forth in Paragraphs 1 through 110 as if fully set forth at length herein.

112.    The foregoing actions of defendant constitute actionable discrimination in violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 *et. seq.*

113.    The actions of Defendant were severe or persuasive enough to make Dr. Rossi believe that the conditions of his employment had been altered and that the working environment was hostile and/or abusive.

114.    Vericare's upper management, specifically, Myll, Watson and Bird, minimized Dr. Rossi's efforts and involvement within Vericare, ignored Dr. Rossi's suggestions for business development and instead put pressure on Dr. Rossi to conduct fraudulent business.

115.    Vericare's management also consistently accused Dr. Rossi's region of being unsuccessful despite proof that it held the top position in New Jersey and faced growing competition.

116.    Specifically, on or around May 28, 2012, Myll sent electronic correspondence to Dr. Rossi wherein he states: "I wanted to get back to you regarding your option request. Given the company's overall 2011 disappointing performance, only the relatively small number of options granted to employees under the standing policy, is all that the BOD is up for granting

28

now.  The performance of your NJ and MA regions did not set you apart of overall company results to lead the BOD to an exception for you."

117.   In addition, on or around December 7, 2012, Myll sent electronic correspondence to Dr. Rossi copying Watson and Bird wherein he states:   "Your region is performing significantly behind our mutually prepared plan and last year.  Let's put it into perspective.  Less than last year in a growing market!   Now we can talk about the reasons behind this disappointment but in the end what we are doing in New Jersey has not worked this year.  Blaming it on competition as if it is solely an external factor that we have no control over is not acceptable.  Changes in new ideas, new disciplines teamwork, etc. are needed.  From what I can tell, we have not adjusted our strategy in New Jersey for our base business."

118.   In 2012, Dr. Rossi supervised Regional Manager Fairorth.  Vericare provided Fairorth with a sizable bonus for 2012 to which Dr. Rossi helped him achieve yet Vericare awarded no bonus to Dr. Rossi for his efforts in 2012.

119.   Shortly thereafter, in December 2012, Fairorth was laid off and Vericare put Dr. Rossi along with Regional Manager, Lisa Galasso, in charge of Fairorth's region, which included Pennsylvania and Delaware.  This led to an immense increase in workload yet Dr. Rossi received no salary increase.  Dr. Rossi was now serving as the Vice President and General Manager of Vericare's Mid-Atlantic Region.

120.   In January 2013, Dr. Rossi complained to Dr. Thomas Cooper, Chairman of the Board of Directors, regarding Vericare's fraudulent practices and the hostile work environment caused by Vericare's upper management.

121.    Myll called Dr. Rossi just before Dr. Rossi's meeting with Dr. Cooper to reprimand him for complaining to Dr. Cooper.  Myll pressed Dr. Rossi to tell him what Dr. Rossi was going to tell Dr. Cooper prior to Dr. Rossi's meeting with Dr. Cooper.

122.    After Dr. Rossi complained to Dr. Cooper, Vericare removed two territories from Dr. Rossi and put them under the supervision of a younger person.  In addition, Dr. Rossi was thereafter excluded from meetings and communications regarding a facility called Buttonwood, which he was instrumental in bringing to Vericare.  Plans and issues were discussed and formulated without any input from Dr. Rossi although he was the contact person and the originator of this business venture.

123.    Vericare hired a consultant in response to Dr. Rossi's complaint.  The consultant conducted a sham investigation into Dr. Rossi's complaints.  The investigation was never concluded and no findings were issued.

124.    On or around May 22, 2013, Dr. Rossi's counsel sent correspondence to Vericare's counsel providing a copy of Dr. Rossi's complaint to Dr. Cooper and informing Vericare's counsel of the retaliation that has followed.

125.    On or around May 31, 2013, in retaliation for Dr. Rossi's reporting Vericare's fraudulent practices and discriminatory actions towards him, Vericare turned off Dr. Rossi's cell phone.

126.    Subsequently, on or around June 15, 2013, in further retaliation for Dr. Rossi's complaints regarding discrimination by upper management at Vericare and the company's violations of Medicare and Medicaid, Vericare terminated Dr. Rossi's employment.

127.   As a direct and proximate result of Defendant's actions in violation of the NJLAD, Dr. Rossi has suffered severe emotional distress with physical manifestations, humiliation, embarrassment, loss of income, and other severe financial losses.

WHEREFORE, Bart Rossi, demands judgment against the defendant, Vericare, for compensatory damages, punitive damages, attorney's fees, interest, cost of suit, and such other and further relief as the Court deems equitable and just.

## SEVENTH COUNT
**Violations of Florida False Claims Act: Presenting False Claims for Payment**
**(Fla. Stat. § 68.081 et seq.)**

128.   Dr. Rossi, on behalf of the State of Florida, repeats and realleges the allegations as set forth in Paragraphs 1 through 127 as if fully set forth at length herein.

129.   Dr. Rossi, on behalf of the State of Florida, seeks relief against defendant under the Florida False Claims Act, Fla. Stat. § 68.083(2).

130.   As set forth above, in connection with the foregoing schemes, defendant knowingly, or with reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presents and/or caused to be presented, and may still be presenting, false or fraudulent claims for payment by Florida's Medicaid program in violation Fla. Stat. § 68.082(2)(a).

131.   Beginning in 2012, Vericare began violating Florida's Medicaid provisions, by submitting fraudulent claims to Medicaid, which included billing for services and follow-up services for patients that were unnecessary, such as psychotherapy and psychological services for patients who lacked the capacity to benefit from these services because they were suffering from severe dementia and/or cognitive disorders.

132.     Vericare also billed Florida's Medicaid program for unnecessary and duplicative psychiatric diagnostic examinations that violated Medicaid rules in that the Vericare doctor or other medical professional conducting the examination failed to (i) document the patient's medical and/or psychiatric history, (ii) conduct an adequate mental status test, (iii) coordinate with other health care professionals treating the patient, and/or (iv) otherwise comply with Medicaid rules.   In addition, Vericare billed for services without any documentation in the medical record to substantiate the services.

133.     At the same time, Vericare's compliance program was inadequate to counter those incentives by ensuring that unnecessary and duplicative services were not billed.  As a result, Vericare submitted thousands of fraudulent claims to Florida's Medicaid program and were paid based on those claims.

134.     These newly adopted practices of Vericare led to extremely excessive billing for evaluations, a significant amount of unnecessary psychological evaluations and hundreds of thousands of needless psychotherapy follow-up sessions.   These illegal practices were implemented solely to increase Vericare's profits.  These practices were a violation of Florida's Medicaid's provisions and Vericare improperly received funds allocated for the Florida's Medicaid program.

135.     The State of Florida, or it political subdivisions, unaware of the falsity of the claims made by Defendants and in reliance on the accuracy of these claims, paid, and may continue to pay, for services for recipients of Medicaid.

136.     As a result of Defendant's actions, as set forth above, the State of Florida and/or its political subdivisions have been, and may continue to be, severely damaged.

137.     Dr. Rossi prays that judgment be entered against Defendant for restitution to the State of Florida for the value of payments or benefits provided, directly or indirectly, as a result of Defendant's unlawful acts, as provided for in Fla. Stat. § 68.082(2), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each false claim as provided by Fla. Stat. Ann. § 68.082(2), to the extent such multiplied penalties shall fairly compensate the State of Florida or its agencies for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery.

## EIGHTH COUNT
### Violations of North Carolina False Claims Act:
### Presenting False Claims for Payment
### (N.C. Gen. Stat. § 1-605)

138.     Dr. Rossi, on behalf of the State of North Carolina, repeats and realleges the allegations as set forth in Paragraphs 1 through 137 as if fully set forth at length herein.

139.     Dr. Rossi, on behalf of the State of North Carolina, seeks relief against defendant under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-608(b).

140.     As set forth above, in connection with the foregoing schemes, defendant knowingly, or with reckless disregard or deliberate ignorance of the truth or falsity of the information involved, makes and/or caused to be made, and may still be making, false or fraudulent claims for payment by North Carolina's Medicaid program for services that were inappropriate, in violation of N.C. Gen. Stat. § 1-607(a)(1).

141.     Beginning in 2012, Vericare began violating North Carolina's Medicaid provisions, by submitting fraudulent claims to Medicaid, which included billing for services and follow-up services for patients that were unnecessary, such as psychotherapy and psychological

33

services for patients who lacked the capacity to benefit from these services because they were suffering from severe dementia and/or cognitive disorders.

142.    Vericare also billed North Carolina's Medicaid program for unnecessary and duplicative psychiatric diagnostic examinations that violated Medicaid rules in that the Vericare doctor or other medical professional conducting the examination failed to (i) document the patient's medical and/or psychiatric history, (ii) conduct an adequate mental status test, (iii) coordinate with other health care professionals treating the patient, and/or (iv) otherwise comply with Medicaid rules.  In addition, Vericare billed for services without any documentation in the medical record to substantiate the services.

143.    At the same time, Vericare's compliance program was inadequate to counter those incentives by ensuring that unnecessary and duplicative services were not billed.  As a result, Vericare submitted thousands of fraudulent claims to North Carolina's Medicaid program and were paid based on those claims.

144.    These newly adopted practices of Vericare led to extremely excessive billing for evaluations, a significant amount of unnecessary psychological evaluations and hundreds of thousands of needless psychotherapy follow-up sessions.   These illegal practices were implemented solely to increase Vericare's profits.  These practices were a violation of North Carolina's Medicaid's provisions and Vericare improperly received funds allocated for the North Carolina Medicaid program.

145.    The State of North Carolina, or it political subdivisions, unaware of the falsity of the claims made by Defendants and in reliance on the accuracy of these claims, paid, and may continue to pay, for services for recipients of Medicaid.

146.     As a result of Defendant's actions, as set forth above, the State of North Carolina and/or its political subdivisions have been, and may continue to be, severely damaged.

147.     Dr. Rossi prays that judgment be entered against Defendant for restitution to the State of North Carolina for the value of payments or benefits provided, directly or indirectly, as a result of Defendant's unlawful acts, as provided for in N.C. Gen. Stat. § 1-607, multiplied as provided for in N.C. Gen. Stat. § 1-607(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) as provided by N.C. Gen. Stat. § 1-607(a), to the extent such multiplied penalties shall fairly compensate the State of North Carolina for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery.

**NINTH COUNT**
**Violations of Texas Medicaid Fraud Prevention Act:**
**Presenting False Claims for Payment**
**(Tex. Hum. Res. Code Ann. § 36.101(a))**

148.     Dr. Rossi, on behalf of the State of Texas, repeats and realleges the allegations as set forth in Paragraphs 1 through 147 as if fully set forth at length herein.

149.     Dr. Rossi, on behalf of the State of Texas, seeks relief against defendant under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.101(a).

150.     As set forth above, in connection with the foregoing schemes, defendant knowingly, or with reckless disregard or deliberate ignorance of the truth or falsity of the information involved, makes and/or caused to be made, and may still be making, false or fraudulent claims for payment by Texas's Medicaid program for services that were inappropriate, in violation of Tex. Hum. Res. Code Ann. § 36.002(7).

151.    Beginning in 2012, Vericare began violating Texas's Medicaid provisions, by submitting fraudulent claims to Medicaid, which included billing for services and follow-up services for patients that were unnecessary, such as psychotherapy and psychological services for patients who lacked the capacity to benefit from these services because they were suffering from severe dementia and/or cognitive disorders.

152.    Vericare also billed Texas's Medicaid program for unnecessary and duplicative psychiatric diagnostic examinations that violated Medicaid rules in that the Vericare doctor or other medical professional conducting the examination failed to (i) document the patient's medical and/or psychiatric history, (ii) conduct an adequate mental status test, (iii) coordinate with other health care professionals treating the patient, and/or (iv) otherwise comply with Medicaid rules.  In addition, Vericare billed for services without any documentation in the medical record to substantiate the services.

153.    At the same time, Vericare's compliance program was inadequate to counter those incentives by ensuring that unnecessary and duplicative services were not billed.  As a result, Vericare submitted thousands of fraudulent claims to Texas's Medicaid program and were paid based on those claims.

154.    These newly adopted practices of Vericare led to extremely excessive billing for evaluations, a significant amount of unnecessary psychological evaluations and hundreds of thousands of needless psychotherapy follow-up sessions.   These illegal practices were implemented solely to increase Vericare's profits.  These practices were a violation of Texas's Medicaid's provisions and Vericare improperly received funds allocated for Texas's Medicaid program.

155. The State of Texas, or it political subdivisions, unaware of the falsity of the claims made by Defendants and in reliance on the accuracy of these claims, paid, and may continue to pay, for services for recipients of Medicaid.

156. As a result of Defendant's actions, as set forth above, the State of Texas and/or its political subdivisions have been, and may continue to be, severely damaged.

157. Dr. Rossi prays that judgment be entered against Defendant for restitution to the State of Texas for the value of payments or benefits provided, directly or indirectly, as a result of Defendant's unlawful acts, as provided for in Tex. Hum. Res. Code Ann. § 36.052(a), multiplied as provided for in Tex. Hum. Res. Code Ann. § 36.052(a)(4), the interest on the value of such payments or benefits at the prejudgment interest rate in effect on the day the payment or benefit was paid or received, for the period from the date the payment or benefit was paid or received to the date that restitution is made to the State of Texas, pursuant to Tex. Hum. Res. Code Ann. § 36.052(a)(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than fifteen thousand dollars ($15,000) for each unlawful act committed that resulted in injury to an elderly or disabled person, and of not less than one thousand dollars ($1,000) or more than ten thousand dollars ($10,000) for each unlawful act committed that did not result in injury to an elderly or disabled person, pursuant to Tex. Hum. Res. Code Ann. §§ 36.052(a)(3)(A) and (B), to the extent such multiplied penalties shall fairly compensate the State of Texas for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery.

## JURY DEMAND

Plaintiff, the United States *ex rel* Bart Rossi, demand a trial by Jury.

## NOTICE OF DESIGNATION OF TRIAL COUNSEL

Plaintiff hereby designates Lisa M. Fittipaldi, Esq. as its trial counsel in this matter.

DIFRANCESCO, BATEMAN, COLEY, YOSPIN,
KUNZMAN, DAVIS, LEHRER & FLAUM, P.C.
Attorneys for Plaintiff/Relator

By: _____
Lisa M. Fittipaldi

Dated:  November 1, 2013